# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

---

**LACKS ENTERPRISES, INC.,**
a Michigan corporation, and **LACKS**
**HOME PRODUCTS, LLC**,  a
Michigan limited liability company,

                    Plaintiffs,

v.                                              Civil Action No. 1:15-cv-00990

**HD SUPPLY, INC.,**  a Delaware corporation,
and **HOME DEPOT U.S.A., INC.**, a Delaware
corporation,

                    Defendants.                 **Jury Trial Demanded**

---

John S. Artz (P48578)                    Pamela C. Enslen (P33368)
Franklin M. Smith (P76987)               WARNER NORCROSS & JUDD LLP
DICKINSON WRIGHT PLLC                     401 East Michigan Avenue
2600 West Big Beaver Rd., Ste. 300       Suite 200
Troy, MI 48084                           Kalamazoo, Michigan 49007-5842
(248) 233-7200                           (616) 752-2000
jsartz@dickinsonwright.com               penslen@wnj.com
fsmith@dickinsonwright.com

                                         Ronan P. Doherty
*Attorneys for Plaintiffs*               Georgia Bar No. 224883
                                         Fredric J. Bold, Jr.
                                         Georgia Bar No. 544604
                                         BONDURANT, MIXSON & ELMORE,
                                         LLP
                                         3900 One Atlantic Center
                                         1201 West Peachtree Street, N.W.
                                         Atlanta, GA 30309
                                         (404) 881-4100

                                         *Attorneys for Defendants*

---

## FIRST AMENDED COMPLAINT

Plaintiffs, Lacks Enterprises, Inc. ("Lacks Enterprises") and Lacks Home Products, LLC ("Lacks Home") (collectively referred to herein as "Lacks" and/or "Plaintiffs"), complain and allege as follows against Defendants, HD Supply, Inc. ("HD Supply") and Home Depot U.S.A., Inc.. ("Home Depot," and, together with HD Supply, "Defendants"):

### THE PARTIES

1.      Plaintiff Lacks Enterprises, Inc. ("Lacks Enterprises") is a Michigan corporation with its principal place of business at 5460 Cascade Road SE, Grand Rapids, MI 49546.

2.      Plaintiff Lacks Home Products, LLC ("Lacks Home Products") is a Michigan corporation with its principal place of business at 4245 52nd Street, SE, Kentwood, MI 49512.

3.      Upon information and belief Defendant HD Supply, Inc. ("HD Supply") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 3100 Cumberland Blvd., Suite 1480, Atlanta, Georgia 30339 and which is doing business in this Judicial District.

4.      Upon information and belief Defendant Home Depot U.S.A., Inc. ("Home Depot") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 2455 Paces Ferry Road, Northwest, Atlanta, Georgia 30339 and which is doing business in this Judicial District, including through advertising, marketing, selling and/or offering to sell the subject product.

### JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, 35 U.S.C. §1 *et seq.* and is an action for, among other things, patent infringement based on 35 U.S.C. §271.

1

6.     This Court has exclusive subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§1331, 1338(a), and 15 U.S.C. § 1121.

7.     This Court has personal jurisdiction over Defendants because each of these entities has committed and continues to commit acts of patent infringement in violation 35 U.S.C. §271 and places infringing products into the stream of commerce with the knowledge that such products are sold in the State of Michigan, including in this District.

8.     Diversity jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1332 because (a) the parties are diverse and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over Defendants pursuant to M.C.L. §§ 600.715 and 600.735 because each of these entities has transacted business within the State of Michigan, each has committed acts or caused to be committed acts within Michigan, including in this judicial district, that give rise to the claims asserted herein, and each has established sufficient minimum contacts with the forum such that the exercise of jurisdiction over each would not offend traditional notions of fair play and substantial justice.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 and 28 U.S.C. §1400(b).

2

## BACKGROUND AND GENERAL ALLEGATIONS

*Lacks' Business Endeavors*

11.     Lacks Enterprises is a privately held family-owned company that is primarily in the business of manufacturing and supplying a variety of automotive products, including exterior trim products, interior trim products, radiator grills, and wheel trim products.

12.     In recent years, Lacks Enterprises began exploring a new business segment surrounding architectural products for home exteriors and has devoted considerable resources toward the conception, design and development of such products.

13.     Lacks Home was an entity created to pursue this new business segment. Lacks Home is a wholly owned subsidiary of Lacks Enterprises.

14.     Lacks Home invested considerable resources researching, designing and developing garage door accent products which were introduced and are currently marketed under the trademark "Coach House Accents."

15.     The garage door accent products include decorative simulated window overlays ("Faux Garage Door Windows") and decorative hardware kits, which consist of decorative handles and hinges ("Faux Garage Door Hardware", and collectively the "Faux Garage Door Products") that allow a home owner to easily upgrade the exterior appearance of their garage door at reasonable cost.

16.     Lacks Home introduced its Faux Garage Door Products into the market in early 2011 and extensively promoted these products at various industry trade shows and exhibitions throughout 2011.

3

17.     Lacks Home has enjoyed considerable success with respect to its Faux Garage Door Products, partnering with Lowes and selling, on average, 200 Faux Garage Door Windows per month.

### *Lacks' Intellectual Property Rights and the Patent Infringement Action*

18.     After developing the Faux Garage Door Products, Lacks sought to protect its innovations by securing patent protection.

19.     Accordingly, Lacks filed both design and utility patent applications with the United States Patent and Trademark Office ("USPTO").

20.     Specifically, Lacks filed a utility patent application on a "Garage Door and Faux Window Façade Assembly" on February 3, 2011, which is identified by U.S. Patent Publication No. 2012/0198772 (the "772 Published Patent Application").

21.     The '722 Published Patent Application is assigned to Lacks Enterprises.

22.     Further, Lacks filed a design patent application, entitled "A Faux Window Assembly", which issued as U.S. Design Patent No. D668,784 ("the 'D784 Patent") on October 9, 2012 (attached as **Exhibit A**).

23.     The 'D784 Patent is assigned to Lacks Enterprises such that it is the sole owner of all right, title and interest in same.

24.     Lacks Home is the exclusive licensee under the 'D784 Patent and the '722 Published Application.

4

25.     Beginning in or about June 2011 and continuing through approximately November 2011, HD Supply and Crown Bolt, a former subdivision of HD Supply, expressed interest in the Faux Garage Door Products being developed by Lacks.

26.     The parties discussed a potential relationship and incident to those discussions, the parties entered into a Non-Disclosure Agreement ("NDA") (attached as **Exhibit B**) which allowed Lacks to share its Faux Garage Door Products and commercial plans with respect to same with HD Supply and Crown Bolt.

27.     Pursuant to the NDA, Lacks then provided HD Supply and Crown Bolt with information regarding its marketing, pricing, cost payment terms and profit margin expectations with respect to the Faux Garage Door Products.

28.     Ultimately, the discussions proved unsuccessful and the parties did not enter into a business relationship.

29.     Thereafter, HD Supply and Crown Bolt introduced into the market place decorative faux windows and decorative hardware for garage doors, which mimicked those products Lacks shared with them under the NDA.

30.     HD Supply and Crown Bolt offered the products for sale via Home Depot and identified the garage door products as "Decorative Window Panels."

31.     Accordingly, and as a result of the foregoing actions, on October 9, 2012, Lacks filed a patent infringement action against HD Supply and Crown Bolt in the United States

5

District Court for the Eastern District of Michigan, captioned as *Lacks Enterprises, Inc., et al. v. HD Supply, Inc. et al.*, Case No. 2:12-cv-14472-DPH-DRG (the "Patent Infringement Action").

### The Settlement Agreement

32.     In or about December 2012, Lacks, HD Supply and Crown Bolt entered into settlement discussions regarding the Patent Infringement Action, including a meeting in Grand Rapids with the principals of all parties being present.

33.     During the course of these discussions, HD Supply and Crown Bolt made certain representations regarding the market for its products and the projected sales of their Faux Garage Door Products.

34.     During those discussions, Lacks identified significant concerns it had about the quality of the Decorative Windows Panels introduced into the market and HD Supply and Crown Bolt agreed to take certain steps to ensure the quality of Defendants Faux Garage Door Products would not damage the market for Lacks' Faux Garage Door Products.

35.     In reliance on these representations, Lacks entered into a Settlement Agreement with HD Supply and Crown Bolt,[1] effective January 1, 2013 (attached as **Exhibit C**), whereby it

---

[1] The original parties to the Settlement Agreement were Lacks, HD Supply, HD Supply Distribution Services, LLC and Crown Bolt.  *See* Ex. C.  Upon information and belief, in or about December 2014, Home Depot acquired the Crown Bolt division of HD Supply. Similarly, in or about January 2015, Home Depot acquired HD Supply Distribution Services, LLC.  The Settlement Agreement provides that its terms shall be binding and inure to the benefit of the parties thereto and any successor in interest. *See* Ex. C, §10.6. Accordingly, Defendants are bound by its terms.

granted to HD Supply and Crown Bolt an exclusive license to sell its Faux Garage Door Products in a limited market channel.

36.    Specifically, pursuant to the Settlement Agreement, Lacks agreed to grant HD Supply and Crown Bolt a license (the "License") to make, have made, sell, offer to sell, use, import and export Faux Garage Door Windows under the 'D784 Patent and the '722 Published Patent Application. Ex. C, § 3.1.

37.    The License provided that HD Supply and Crown Bolt were permitted to sell and offer to sell the Faux Garage Door Windows exclusively via Home Depot, its affiliates, and its online stores only. *Id.*

38.    In exchange for the License, HD Supply and Crown Bolt agreed to pay a royalty fee for each Faux Garage Door Window Kit sold by HD Supply or Crown Bolt. *Id.* at § 4.1. Each Faux Garage Door Window Kit includes two Faux Garage Door Windows.

39.    HD Supply and Crown Bolt agreed to pay such royalties as measured by the gross Faux Garage Door Window Kits sold, less any buybacks or returns, as those terms are defined in the Settlement Agreement. *Id.*

40.    The Settlement Agreement was to continue in full force and effect for a period of five years and is scheduled to expire on January 1, 2018. *Id.* at § 7.1.

41.    Notwithstanding, the Settlement Agreement provides that it may be terminated sooner than January 1, 2018, in accordance with the terms of the Settlement Agreement. *See id.*

42.    Section 7.2 provides, in relevant part:

7

This Agreement may be terminated by either Party for a material breach by the other party of the provisions hereof. Such termination will be effective sixty (60) days after written notice to the other Party of the breach if the breach has not been remedied.

(a) If any royalty, deficiency or other amounts due under this Agreement are not paid by Licensee to Licensor, as defined in the License Agreement, within fifteen (15) days of the date when due and at least seven (7) calendar days have passed after notice to Licensee of lack of payment, or

(b) if either Party shall fail to keep and perform any of the other covenants, agreements or conditions of this Agreement on its part to be performed (other than as provided in Paragraph 7.3 herein) and such failure continues for a period of thirty (30) days after given written notice of such failure, then such Party shall be in default whereupon the other Party may at its option terminate the Agreement and License Agreement under Article IV by written notice to the defaulting Party.

43.     Similarly, pursuant to the License Agreement, the "License shall expire or terminate upon the conclusion of the Term, as defined in the [Settlement Agreement] *unless otherwise terminated earlier.*" *Id.* at Ex. A, § 3 (emphasis added).

44.     Thus, the parties were entitled to terminate the Settlement Agreement, including the License, in accordance with Section 7.2.

### *Defendants' Breaches of the Settlement Agreement*

### Lacks' Quality Concerns Regarding Defendants' Products

45.     Prior to entering into the Settlement Agreement, Lacks had concerns regarding the quality of Defendants' Faux Garage Door Windows, including discoloration.

46.     Accordingly, the parties negotiated terms to address Lacks' quality concerns and to ensure that Lacks would not be irreparably harmed by a substandard licensed product and to protect Lacks' investment in its own Faux Garage Door Windows.

8

47.     Pursuant to the Settlement Agreement, the parties expressly recognized Lacks' quality concerns and Lacks agreed to provide separate documentation of those concerns. *Id.* at § 9.1.

48.     Moreover, the parties agreed that they would work together to seek resolution for the quality concerns for the manufacturing and production of Defendants' Faux Garage Door Windows. *Id.* at § 9.2.

49.     Defendants also agreed that, upon the parties' identification of a solution, Defendants would implement such solution in future products if it did not add to the cost of Defendants' Faux Garage Door Windows. *Id.*

50.     Notwithstanding the quality control provisions, Lacks' quality concerns with respect to Defendants' Faux Garage Door Windows have persisted without correction.

51.     To validate its quality concerns, Lacks conducted testing of Defendants' Faux Garage Door Windows whereby a Thermo Cycle oven was used to determine the temperature at which Defendants' products warp and at which the components of Defendants' products separate.

52.     Pursuant to the testing conditions, the oven temperature is increased 20 degrees Fahrenheit every five hours over a range that begins with 120 degrees Fahrenheit and concludes at 180 degrees Fahrenheit.

53.     The testing procedures are the standard testing procedures to which Plaintiffs own products are subjected.

9

54.     The results of the testing (attached as **Exhibit D**) revealed that Defendants' Faux Garage Door Windows begin to significantly warp at 120 degrees Fahrenheit.

55.     In contrast, Plaintiffs' Faux Garage Door Windows develop only a minor warp at approximately 160 degrees Fahrenheit.

56.     Accordingly, the testing raised concerns regarding the ability of Defendants' Faux Garage Door Products to withstand weather conditions in certain geographic regions.

57.     Moreover, Lacks also expressed concerns regarding the yellowing of Defendants' Faux Garage Door Windows, which has also been the subject of repeated complaints by Defendants' customers.

58.     The following photos illustratively compare Lacks' Faux Garage Door Windows, which retain their intended color, and Defendants' products, which significantly yellow:







59.     Upon information and belief, the significant yellowing is caused by the materials from which Defendants' Faux Garage Door Windows are constructed.

60.     Lacks made several efforts to resolve the quality concerns with Defendants, including by providing testing data (attached as **Exhibit E**) which demonstrated the existence of the yellowing problem and by making recommendations to cure the defect.

11

61.     Notwithstanding Lacks' efforts, Defendants failed to correct these quality concerns or otherwise meaningfully participate in resolving the matter.

62.     Instead, after Lacks provided its testing data and recommendations, customers continued to complain that Defendants' Faux Garage Door Windows yellowed, which rendered the product unattractive.

63.     Indeed, customers have continued to complain of the yellowing up through the filing of the Complaint.

64.     As recently as September 12, 2015, a customer commented that Defendants' Faux Garage Door Window had "turned very yellow. It looks horrible." Another customer commented on August 4, 2015 that Defendants' Faux Garage Door Window had taken on a beige appearance, "was no longer appealing," and was an "[i]nferior product." Yet another customer commented on June 29, 2015 that Defendants' Faux Garage Door Window had "turned yellow within months" and that the product is "not made to stand the outdoor weather or sun." (**Supplemental Exhibit F attached hereto**). These exemplary customer complaints were directed to Defendants' Faux Garage Door Window on Home Depot's website.

65.     To verify some of these complaints, Lacks acquired sample Faux Garage Door Windows from multiple customers who purchased Defendants' products and were dissatisfied as a result of the undesirable yellowing.

66.     After obtaining the samples, Lacks commissioned tests that confirmed that the complained-of products obtained from unhappy customers were constructed of the same

deficient material as the material previously identified by Lacks as being responsible for the yellowing issue.

67.     The testing of the Faux Garage Door Window samples confirmed that Defendants' Faux Garage Door Windows were constructed of a subpar material that would invariably yellow when subjected to normal weather conditions.

68.     Moreover, when compared with Lacks' Faux Garage Door Windows, the testing revealed that Defendants' products would begin to significantly yellow after only 8 hours of exposure, while Lacks' products are designed to withstand a minimum of 3,000 hours of exposure.

69.     As a result of the continued quality concerns regarding Defendants' Faux Garage Door Windows, Lacks formally notified Defendants of the breach, among other breaches, in correspondence dated June 19, 2015 (the "First Default Letter") (attached as **Exhibit G**).

70.     In their First Default Letter, Lacks informed Defendants that, if the quality concerns were not addressed within thirty days as required by the Settlement Agreement, the Settlement Agreement would be deemed terminated in accordance with Section 7.2 as a result of Defendants' material breach thereof. *See* Ex. G.

71.     Thereafter, in or about July 2015, Plaintiffs' Counsel was informed that Home Depot acquired Crown Bolt and would be responsible for addressing matters relating to the Settlement Agreement, including the First Default Letter.

72.     Furthermore, incident to Home Depot's acquisition, Crown Bolt forwarded the First Default Letter to Home Depot on or about June 23, 2015.

73.     Notwithstanding, Home Depot failed to respond to the First Default Letter within thirty days of receipt.

74.     As a result, on July 31, 2015, Plaintiffs' Counsel sent an additional notice of breach of the Settlement Agreement (the "Second Default Letter") (attached as **Exhibit H**) which reiterated and expounded upon the breaches set forth in the First Default Letter.[2]

75.     In response, on August 5, 2015, Home Depot sent correspondence to Lacks (attached as **Exhibit I**) in which it disagreed with Lacks' allegations regarding the yellowing of its product, despite numerous customer complaints and test results to the contrary.

76.     Moreover, Defendants' Counsel asserted that Sections 9.1 and 9.2 of the Settlement Agreement regarding quality concerns only apply to products manufactured after the effective date of the Settlement Agreement. *See* Ex. I.

77.     Defendants' Counsel further alleged that *all* existing inventory of their Faux Garage Door Products, more than two-and-a-half years after the execution of the Settlement Agreement, was produced prior to the effective date thereof.  *Id.*

78.     Nevertheless, Counsel for Defendants stated that the client would be notified of the discoloration claims in an effort to seek resolution.  *Id.*

---

[2] The Second Default Letter also asserted an additional breach of the Settlement Agreement for underpayment of royalties, as further explained herein.

14

79.     However, and unbeknownst to Lacks, Defendants stock-piled inventory prior to entering into the Settlement Agreement for the purpose of subverting the intent of the Settlement Agreement.

80.     In other words, upon information and belief, during the course of the parties' settlement negotiations, Defendants never intended to be bound by the quality control provisions.

81.     Given the extent of Lacks' quality concerns with respect to Defendants' products, Lacks would not have entered into the Settlement Agreement but for the representations of Defendants with respect to making good-faith efforts to improve the quality of their products.

82.     Notwithstanding Defendants' assertions, upon information and belief, Defendants have manufactured and produced several different models of their Faux Garage Door Products since the effective date of the Settlement Agreement.

83.     Accordingly, Defendants were required to attempt to resolve the quality concerns as to those products in order to protect Plaintiffs' investment and licensed product pursuant to the Settlement Agreement. *See* Ex. C, § 9.1-9.2.

84.     Ultimately, while the parties engaged in further correspondence on this subject, Defendants have continued to assert that they have no product which was manufactured after the effective date of the Settlement Agreement and, accordingly, that Defendants have no obligation to address the issues caused by their subpar materials.

85.     Additionally, over the last couple of months, Lacks has received numerous calls from dis-satisfied customers who had purchased the Faux Garage Door Windows from Home

Depot and called Lacks to complain about the quality of those products, including undesirable yellowing.

86.     Since January 1, 2016, Lacks has received on average 2-3 of these customer calls per week.

87.     Some of these Home Depot customers have contacted Lacks mistakenly believing that Lacks was the supplier of the product about which they were calling to complain.

88.     Others of these Home Depot customers have contacted Lacks after they first approached Home Depot with their complaint, but were informed by Home Depot that their money would not be refunded.

89.     Instead, as Lacks was advised by these customers, Home Depot merely offered to replace the product they purchased with another of the same product, which is constructed of the same material.

90.     Lacks has replaced some of these customers products at its own expense to try and protect its brand and the market for these products. Since January 1, 2016, Lacks has replaced the sub-standard Faux Garage Door Windows purchased from Home Depot of six (6) customers with its own products at no cost to the customers.

**Defendants' Underpayment of Royalties**

91.     As stated herein, HD Supply and Crown Bolt made certain representations as to the sales projections of its Faux Garage Door Products to entice Plaintiffs to enter into the

Settlement Agreement and ultimately withdraw their Motion for Preliminary Injunction with respect to the Patent Infringement Action.

92.     In light of Defendants' representations regarding their projected sales, HD Supply and Crown Bolt's royalty payment for the 4th Quarter of 2013 raised concerns with respect to the accuracy of Defendants' reporting of royalty fees.

93.     As a result, in or about January 2014, Tim Grant, Lacks' Product Manager, contacted Ramesh Shenoy, HD Supply's Senior Director of Marketing and Sales, to discuss the discrepancy between the sales projections and the royalty payment.

94.     In response, Defendants provided sales information which purportedly supported the significantly lower royalty payment.

95.     Nevertheless, after royalty payments continued to be significantly lower than Defendants' projections, as well as Plaintiffs' own sales, Lacks performed an in-depth market analysis which revealed that sales of Defendants' Faux Garage Door Products likely exceeded those reported to Lacks pursuant to the Settlement Agreement.

96.     Furthermore, to verify that Defendants' sales of their Faux Garage Door Products were not being accurately reported, Lacks employed the use of a software program in order to monitor the inventory turnover and thus the number of sales of Defendants' products in various Home Depot stores.

97.     The software program functions by monitoring the inventory of Defendants' Faux Garage Door Products for a specific date range and for specific Home Depot locations and then generating a report which provides the total number of sales for the specified period and store.

98.     In addition to Plaintiffs' market analysis, the software program revealed that Defendants have repeatedly submitted royalty payments which reflect substantially lower sales of their Faux Garage Door Products than have actually occurred.

99.     Lacks also called certain of the stores to verify the inventory reports they had generated from this software programs, which inventory numbers were confirmed.

100.    Accordingly, coupled with the breaches already discussed herein, Plaintiffs' Counsel notified Defendants' Counsel in the Second Default Letter that Defendants are also in breach of the Settlement Agreement by consistently failing to make full and complete payment of royalty fees due pursuant to the Settlement Agreement. *See* Ex. H.

101.    Furthermore, Plaintiffs' Counsel inquired regarding Defendants' sale of their Faux Garage Door Products on Amazon.com, which was not permitted under the Settlement Agreement. *See* Exs. G, H; **Exhibit J**, Aug. 12, 2015 Letter from Artz to Wong.

102.    In response, Defendants merely stated that they had complied with their payment obligations pursuant to the Settlement Agreement. *See* Ex. I.

103.    Responding further, Defendants' Counsel stated, without reference to any support or sales data, that the sales of their Faux Garage Door Products from Amazon.com were included in the prior royalty payments to Lacks. *See* **Exhibit K**, Aug. 31, 2015 Letter from Wong to Artz.

18

104.    However, despite Defendants' purported sales figures, Defendants reported the sale of only 266 units in sixteen (16) months on Amazon.com, while Plaintiffs have averaged sales of approximately 200 units *per month*.

105.    Additionally, despite the Settlement Agreement's requirement that the royalty payments be computed on the basis of gross sales, less buybacks and returns, Defendants' Counsel stated that it has computed royalty payments on the basis of shipments from their warehouses to Home Depot stores, and therefore sales data from individual stores is not relevant to Lacks' royalty entitlements. *See* Ex. K.

106.    Accordingly, Defendants continue to assert that they have fully complied with the terms of the Settlement Agreement and have indicated that they no longer wish to continue dispute resolution efforts, stating that "[t]o the extent further information is requested by Lacks, it may avail itself of the provisions of the [S]ettlement [A]greement and subject to the limitations therein." *See id.*

107.    Despite Defendants' representations to the contrary, Defendants have materially breached the Settlement as described herein.

108.    Moreover, despite receiving notice of such breaches on several occasions, Defendants have failed to cure the complained-of breaches.

109.    As a result, the Settlement Agreement was terminated effective sixty (60) days following Plaintiffs' written notice to Defendants. *See* Ex. C, § 7.2.

19

110.    Plaintiffs' counsel sent Defendants correspondence on several occasions—including on June 19, 2015 and July 31, 2015—indicating that Defendants had breached the Settlement Agreement, which Defendants failed to remedy. *See* Exs. G, H.

111.    Accordingly, the Settlement Agreement was terminated effective September 29, 2015. *See* Ex. C, § 7.2.

## COUNT I
### BREACH OF SETTLEMENT AGREEMENT[3]

112.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

113.    As stated herein, on or about January 1, 2013, the parties entered into the Settlement Agreement, a copy of which is both in Defendants' possession and attached hereto. *See* Ex. C.

114.    The Settlement Agreement acknowledges that Lacks had certain quality concerns with Defendants' Faux Garage Door Products. Ex. C, § 9.1.

115.    Further, the Settlement Agreement requires that the parties

> work together to seek a solution for the Quality Concerns for future manufacture and production runs of the Faux Garage Door Windows occurring after the Effective Date that does not add to the cost of the HD Supply Companies' Faux Garage Door Windows ("Solution"). *Id.* at § 9.2.

---

[3] The Settlement Agreement authorizes claims for breaches of its terms. Ex. C, § 6.3.

116.    If the parties identify a Solution, Defendants agreed to implement such Solution. *Id.*

117.    Defendants breached the quality control provisions of the Settlement Agreement by failing and/or refusing to work with Plaintiffs to identify a Solution regarding the yellowing of Defendants' Faux Garage Door Products.

118.    Defendants further breached the quality control provisions of the Settlement Agreement by failing and/or refusing to consider and/or implement the Solution identified by Plaintiffs and supported by product testing.

119.    Defendants' failure to comply with the conditions of the Settlement Agreement constitutes a material breach thereof warranting termination. Ex. C, § 7.2.

120.    Additionally, pursuant to the Settlement Agreement, Defendants agreed to pay Lacks a royalty fee in exchange for the License. *Id.* at § 4.1.

121.    The Settlement Agreement further provides that underpayment of the royalty fee constitutes a material breach thereof. *Id.* at § 7.2.

122.    Specifically, the Settlement Agreement states:

> If any royalty, *deficiency* or other amounts due under this Agreement are not paid by Licensee to Licensor, as defined in the License Agreement, within fifteen (15) days of the date when due and at least seven (7) calendar days have passed after notice to Licensee of lack of payment . . . then such Party shall be in default whereupon the other Party may at its option terminate the Agreement and License Agreement under Article IV by written notice to the defaulting Party. *Id.* (emphasis added).

21

123.    Upon information and belief, since in or about December 2014, Defendants have reported sales to Plaintiffs that were significantly less than the actual gross sales of Defendants' Faux Garage Door Products for the relevant time period.

124.    Accordingly, upon information and belief, the royalty payments made by Defendants to Plaintiffs since in or about December 2014 have been deficient.

125.    Defendants were notified of the quality control breach and the breach relating to the underpayment of royalties by virtue of the First and Second Default Letters. *See* Ex. G, H.

126.    Moreover, Defendants have failed to cure their defaults within thirty (30) days of notice thereof. *See* Ex C, § 7.5.

127.    Plaintiffs have fully performed under the Settlement Agreement by, among other things, initiating and complying with the dispute resolution procedures contained in Section 7.5 of the Settlement Agreement. *See* Ex. G, H, J.

128.    As a result of the breaches described herein, Defendants have also breached the implied covenant of good faith and fair dealing contained within every contract under Michigan law.

129.    As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages in the amount of the deficient royalty payments, as well as damage to their reputation and investment by virtue of Defendants' continued failure to address the quality concerns with respect to their Faux Garage Door Products.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs in an amount to be determined at trial, plus interest and all attorneys' fees and costs incurred by Plaintiffs in bringing this action, and grant such other and further relief as the Court deems just and equitable.

## COUNT II
### Fraudulent Misrepresentation

130.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

131.    During the course of settlement negotiations with respect to the Patent Infringement Action, Lacks expressed significant concerns regarding the quality of Defendants' products.

132.    Accordingly, the parties negotiated certain quality control provisions—Sections 9.1 and 9.2 of the Settlement Agreement—to ensure that Lacks would not be irreparably harmed by a substandard licensed product and to protect Lacks' investment in its own Faux Garage Door Products.

133.    As such, Defendants represented that they intended to address quality concerns as to their products in good-faith.

134.    However, pursuant to the Settlement Agreement, the quality control provisions applied only to future manufacturing and production of Defendants' product. Ex. C., §9.2.

135.    Unbeknownst to Lacks, and contrary to their representations, Defendants had no intention of being bound by the quality control provisions.

136.    Instead, prior to the execution of the Settlement Agreement, Defendants ordered inventory sufficient to last the length of the term of the Settlement Agreement, such that its inventory would not be subject to the quality control provisions pursuant to Section 9.2.

137.    The end result, then, is that the quality control provisions are meaningless as applied to Defendants—Defendants have refused to correct their subpar products, and thus have damaged Lacks' goodwill and reputation, on the basis that its products predate the Settlement Agreement and are thus not subject to the quality control provisions.

138.    Given Lacks' desire to protect its investment and to ensure the quality of licensed products, Lacks would not have entered into the Settlement Agreement but for Defendants' representations as to the quality control provisions.

139.    At the time the parties were negotiating the Settlement Agreement, Defendants knew that they did not intend to comply with the quality control provisions and intended to deceive Lacks for the purposes of settling the Patent Infringement Action and obtaining the License.

140.    The representations regarding the quality control provisions were false and Defendants knew these representations were false when they were made and/or made the representations recklessly, without any knowledge attesting to their truth, and as a positive assertion.

141.    Defendants made the misrepresentations in order that Lacks would rely on them.

24

142.    Lacks justifiably relied upon Defendants' misrepresentations to their detriment by entering into the Settlement Agreement and granting Defendants the License.

143.    The misrepresentations were material because, but for Defendants' representations that it would address quality concerns as to their products, Lacks would not have entered into the Settlement Agreement with respect to the Patent Infringement Action and jeopardized their investment in their products and their reputation.

144.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have been irreparably harmed as a result of Defendants' substandard licensed product.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs in an amount to be determined at trial, plus interest and all attorneys' fees and costs incurred by Plaintiffs in bringing this action, deem the Settlement Agreement rescinded, as a result of Defendants' fraud in the inducement, and grant such other and further relief as the Court deems just and equitable.

## COUNT III
### DECLARATORY RELIEF

145.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

146.    The Settlement Agreement "may be terminated by either Party for a material breach by the other party of the provisions [t]hereof. Such termination will be effective sixty (60) days after written notice to the other Party of the breach if the breach has not been remedied." Ex. C, § 7.2.

147.    Further, upon notice of a deficiency of payment of the royalty fee, Defendants were required to make such payment within seven (7) days of such notice. *Id.*

148.    Finally, if either party fails to perform any of the covenants, agreements or conditions of the Settlement Agreement and such failure continues for thirty (30) days after written notice thereof, the party that has failed to perform is deemed to be in default under the Settlement Agreement and the non-breaching party may terminate the Settlement Agreement at its option.  *Id.*

149.    Defendants have materially breached the Settlement Agreement by failing to rectify Plaintiffs' quality control concerns and by consistently making deficient royalty payments, as further explained herein.

150.    Defendants were provided written notice of their breaches on several occasions. *See* Ex. G, H, J.

151.    Notwithstanding, Defendants have failed to cure their breaches in accordance with the Settlement Agreement.

152.    Accordingly, as a result of Defendants' material breaches and subsequent failure to cure following notice, the Settlement Agreement is terminated pursuant to Section 7.2.

WHEREFORE Plaintiffs respectfully requests a declaration adjudging that Defendants have materially breached the Settlement Agreement and that the Settlement Agreement is, consequently, terminated, together with their attorney fees, costs and such other and further relief as this Court deems just and proper.

## COUNT IV
### PATENT INFRINGEMENT

153.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

154.    As explained herein, in exchanged for royalty payments and pursuant to the Settlement Agreement, Plaintiffs granted Defendants the License to make, have made, sell, offer to sell, use, import and export Faux Garage Door Windows under the 'D784 Patent and the '722 Published Patent Application. Ex. C, § 3.1.

155.    As a result of Defendants' material breaches, the Settlement Agreement was terminated effective September 29, 2015. *See* Exs. C, § 7.2; G, H.

156.    The termination of the Settlement Agreement terminates the License granted to Defendants. *See* Ex. A to Ex. C, § 3.

157.    Notwithstanding, Defendants have continued to engage in commercial activities, including making, having made, selling, offering to sell, using, importing, and exporting, with respect to the Faux Garage Door Windows.

158.    Defendants' aforementioned commercial activities constitute an infringement of the 'D784 Patent under 35 U.S.C. §271.

159.    On information and belief, Defendants' infringement of the 'D784 Patent has been intentional and willful, making this an exceptional case.

160.    As a result of Defendants' infringing conduct, Plaintiffs have been and will continue to be irreparably harmed and denied the benefit of the protections afforded by the 'D784 Patent by Defendants' infringement thereof.

## COUNT V
### UNFAIR COMPETITION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

161.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

162.    As more fully set forth herein, Defendants' Faux Garage Door Windows are inferior to Plaintiffs' Faux Garage Door Windows, in that Defendants' products significantly yellow after only 8 hours of exposure and significantly warp at normal regional temperatures.

163.    Defendants acts have actually caused or are likely to cause confusion, mistake, or deception as to the source of origin, sponsorship, or approval of Defendant's Faux Garage Door Windows, in that purchasers and others in this District and elsewhere in the United States are likely to believe Plaintiffs authorize and control the sale of Defendants' Faux Garage Door Windows, or that Defendants are associated with or related to Plaintiffs.

164.    Defendants' acts constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

165.    Defendants acted willfully, or, at the very least, recklessly, in engaging in the foregoing conduct.

166.    Defendants' acts greatly and irreparably damage Plaintiffs and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

**COUNT VI**
**UNFAIR COMPETITION IN VIOLATION OF MICHIGAN COMMON LAW**

167.    Plaintiffs incorporate each and every allegation of this Complaint as if fully restated herein.

168.    Plaintiff Lacks has replaced Defendants' defective and sub-standard Faux Garage Door Windows, at its own expense and with owns own product, to try and protect its brand and the market for these products. Plaintiff Lacks has done this for at least six (6) customers since January 1, 2016

169.    Defendants' acts constitute unfair competition with Plaintiffs in violation of the common law of the State of Michigan.

170.    Defendants' acts greatly and irreparably damage Plaintiffs and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

WHEREFORE, Plaintiffs respectfully pray for:

A.      As to Counts I and II, judgment in favor of Plaintiffs in an amount to be determined at trial, plus interest and all attorneys' fees and costs incurred by Plaintiffs in bringing this action;

29

B.      As to Count III, an order deeming the Settlement Agreement rescinded as a result of Defendants' fraud in the inducement;

C.      Judgment that Defendants have infringed the 'D784 Patent in violation of 35 U.S.C. §271(a);

D.      Judgment that Defendants' infringement of the 'D784 Patent has been deliberate and willful;

E.      Preliminary injunctive relief prohibiting further infringement of the 'D784 Patent by Defendants, its officers, agents, employees, representatives, successors and assigns and those acting in privity or concert with them;

F.      Permanent injunctive relief prohibiting further infringement of the 'D784 Patent by Defendants, its officers, agents, employees, representatives, successors and assigns and those acting in privity or concert with them;

G.      Account for and pay over to Plaintiffs all profits that Defendants have derived from its acts of trade dress infringement and unfair competition, offset by royalties paid to Plaintiffs, in accordance with 15 U.S.C. § 1117(a) and Michigan common law;

H.      Pay over to Plaintiffs all damages incurred by Plaintiffs by reason of Defendants' acts of unfair competition in accordance with 15 U.S.C. § 1117(a), and Plaintiffs ask that this damages award be trebled in accordance with 15 U.S.C. § 1117(a);

I.      An award of damages adequate to compensate Plaintiffs for the patent infringement that has occurred pursuant to 35 U.S.C. §284, which shall be trebled as a result of Defendants' willful patent infringement, or an award of Defendants' profits from its infringement pursuant to 35 U.S.C. §289, whichever is greater, together with prejudgment interest and costs;

30

J.       An assessment of costs, including reasonable attorney fees, pursuant to 35 U.S.C.

§285 and 15 U.S.C. § 1117(a), with prejudgment interest;

K.       An award of prejudgment and post judgment interests on the damages caused by

Defendants' acts of infringement; and

L.       Such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Lacks demands a trial by jury on all issues so triable.

Respectfully submitted,

DICKINSON WRIGHT, PLLC

By       <u>/s/John S. Artz              </u>
John S. Artz (P48578)
Franklin M. Smith (P76987)
2600 West Big Beaver Road
Suite 300
Troy, Michigan 48084-3312
(248) 433-7200
jsartz@dickinsonwright.com
fsmith@dickinsonwright.com
Attorneys for Plaintiffs

Dated:  February 12, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2016 I electronically filed the foregoing paper with the Clerk of the United States District Court, Western District of Michigan, using the CM/ECF system, which shall send notification of such filing to all counsel of record.

/s/John S. Artz
John S. Artz (P48578)
2600 W. Big Beaver Rd., Suite. 300
Troy, Michigan 48084-3312
Telephone: (248) 433-7200
jsartz@dickinsonwright.com
Attorneys for Plaintiffs

BLOOMFIELD 29881-4046 1581155v4